PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-2432
_____

UNITED STATES OF AMERICA

v.

CLARENCE POWELL,
                                        Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Criminal No. 09-cr-00574-003
(Honorable J. Curtis Joyner)

_____

Argued June 4, 2012

Before:  SCIRICA, GREENAWAY, JR.
and NYGAARD, *Circuit Judges*.

(Filed: August 30, 2012)

THEODORE C. FORRENCE, JR., ESQUIRE (ARGUED)
Two Penn Center Plaza, Suite 200
1500 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19102

KENNETH C. EDELIN, JR., ESQUIRE
Two Penn Center Plaza, Suite 1410
1500 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19102

                                    Attorneys for Appellant

ROBERT A. ZAUZMER, ESQUIRE (ARGUED)
ARLENE D. FISK, ESQUIRE
THOMAS M. ZALESKI, ESQUIRE
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, Pennsylvania 19106
                                    Attorneys for Appellee

_____

OPINION OF THE COURT

_____

SCIRICA, *Circuit Judge*.

Clarence Powell was convicted under the Hobbs Act, 18 U.S.C. § 1951, for two robberies of business owners in their homes. He challenges the sufficiency of the evidence to establish that the robberies affected interstate commerce and

the jury charge. At issue is whether a different standard governs the Act's jurisdictional requirements when the robbery of business proceeds occurs in the business owner's home rather than on business premises.

## I.

In the summer of 2008, according to the testimony of Powell's cousin and codefendant Michael Lassiter, he and Powell engaged in a series of home robberies of college students and drug dealers in North Philadelphia. Powell and Lassiter decided their crimes were attracting too much attention from law enforcement. They determined instead to rob business owners by following them from their retail stores to their homes, reasoning that there would be less security, fewer witnesses, and more money from the business in owners' houses than in their stores. They specifically targeted immigrant business owners in the belief that those they termed "Chinese people" would keep business proceeds at home because they did not use banks.

In November 2008, Powell, Lassiter, and codefendant Troy Hill cased Star Wigs, a store on 52nd Street in West Philadelphia, and decided to rob the owner when they saw the store's brisk business. Star Wigs was owned by Y.B., a female immigrant from Korea who would take home cash from the business each evening to later deposit in the bank. The store sold merchandise, principally wigs and hair care products, from multiple out-of-state suppliers, including suppliers in New York, New Jersey, and Illinois. On December 1, Powell, Lassiter, and Hill followed Y.B. as she

drove from Star Wigs to her home in Broomall, Pennsylvania. The three men, wearing bandanas over their faces and brandishing two handguns, invaded the home, beat and tied up Y.B. and her husband, and demanded money. The robbers seized $250-$300 in cash from the store's daily sales from Y.B.'s sock, and approximately $2000 in cash from store sales in a jar on the refrigerator, which Y.B. intended to deposit in the bank to cover backdated checks for store merchandise.[1] They also took credit cards, a handgun, jewelry, handbags, family heirlooms, and $1200 in cash that belonged to Y.B.'s husband.

Also in November 2008, Powell, Lassiter, and Hill cased Dollar Plus Discount, a store located across 52nd Street from Star Wigs, similarly observing a large volume of business. Dollar Plus was owned by B.S. and his wife, immigrants from Bangladesh, and purchased merchandise from out-of-state suppliers, including electronics and other items from Baltimore, Maryland. B.S. transported cash and credit card receipts from the store to his home each night in a clear plastic box, where he kept them overnight. In late November, Powell, Lassiter, and Hill followed B.S. and his wife from Dollar Plus to their home in Upper Darby, Pennsylvania. Several weeks later, on December 18, the three men, along with Alexis Byrd-Arroyo, Lassiter's

---

[1] The amount of cash in the jar is disputed. Y.B. testified that it was approximately $2,000 but submitted an insurance claim for $1,060. When questioned about the discrepancy, Y.B. explained that she did not know at the time she submitted the claim how much money was in the jar.

4

girlfriend, returned to B.S.'s house armed with two handguns and a sawed-off shotgun. Powell, Lassiter, and Hill hid at the back of the house and assaulted two of B.S.'s adult daughters when they came home, pushing them inside at gunpoint and demanding their parents' money.[2] One of the daughters led Lassiter upstairs to the plastic box with receipts and petty cash from the business.[3] The robbers took this box along with personal electronics and additional cash, pushed the women into a room, threatening to shoot them if they came out, and left.

B.S.'s daughters then called the police, who put out a radio alert for a robbery in progress. Within thirty seconds of the dispatch, Upper Darby police on patrol a few blocks from B.S.'s house spotted a Ford Crown Victoria driving rapidly toward Philadelphia. They tailed the car into the city and recorded its license plate, but lost the car in traffic. Upper Darby police relayed this information to the Philadelphia police, who later located and set up surveillance on the parked vehicle. Philadelphia police arrested Byrd-Arroyo when she returned to the car, and Upper Darby police obtained a search warrant for the vehicle. Inside they discovered a handgun, a sawed-off shotgun, a plastic container with Dollar Plus receipts and petty cash, and other valuables. The victims of the December 18 robbery identified the items recovered as

---

[2] A third adult daughter was already present in the home.

[3] At the time of the robbery, neither the robbers nor B.S. knew how much money the box contained. The police subsequently determined the box contained $140 in small bills.

5

proceeds of the robbery. Based on information from Byrd-Arroyo, police subsequently arrested Powell, Lassiter, and Hill.

In March 2010, a grand jury in the Eastern District of Pennsylvania returned a five-count indictment against Clarence Powell: one count of conspiracy to interfere with interstate commerce by robbery in violation of 18 U.S.C. § 1951(a), two counts of interference with interstate commerce by robbery in violation of 18 U.S.C. § 1951(a), and two counts of using a firearm during a crime of violence in violation of 18 U.S.C. § 924(c). Powell proceeded to trial. At the close of the evidence, the District Court held a charging conference with trial counsel. Powell moved to dismiss the indictment under Fed. R. Crim. P. 29 for insufficient evidence to establish the effect on interstate commerce. The District Court denied the motion. Over the defendant's objection, the court charged the jury with a modified version of the Third Circuit model jury instruction on the element of "affecting interstate commerce" required for a Hobbs Act conviction. The jury convicted Powell on all five counts. The District Court sentenced Powell to 697 months' imprisonment,[4] with five years' supervised release,

---

[4] The District Court sentenced Powell to ninety-seven months of imprisonment for the Hobbs Act convictions, Counts One, Two, and Four of Powell's indictment. This sentence was the bottom of the recommended range of the Sentencing Guidelines. The District Court sentenced Powell to 600 months' imprisonment for the convictions under 18 U.S.C. § 924(c), Counts Three and Five. Because Powell had a

6

restitution of $20,762.55, and a special assessment of $500. Powell timely appealed.[5]

## II.

On appeal, Powell challenges the sufficiency of the evidence to satisfy the effect on interstate commerce element required for conviction under the Hobbs Act, as well as the jury instructions on this element. These challenges raise a similar issue: namely, whether the robbery of an individual in her home requires proof of a more substantial connection to interstate commerce than a robbery committed at a place of business.

## A.

The Hobbs Act provides "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do . . .

---

previous conviction under 18 U.S.C. § 924(c), the mandatory minimum sentence for each count was 300 months. 18 U.S.C. § 924(c)(1)(C)(i). Moreover, the statute specifies that all terms of imprisonment under § 924 must run consecutively, including the term of imprisonment imposed for the underlying crime of violence. *Id.* § 924(c)(1)(D)(ii). Powell does not challenge the District Court's sentence in this appeal.

[5] The District Court exercised jurisdiction under 18 U.S.C. § 3231. We exercise jurisdiction under 28 U.S.C. § 1291.

shall be fined under this title or imprisoned not more than twenty years, or both." 18 U.S.C. § 1951(a). The statute defines commerce as "all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction." *Id.* § 1951(b)(3). We have held that a conviction under the Hobbs Act requires proof beyond a reasonable doubt that (1) the defendant knowingly or willfully committed, or attempted or conspired to commit, robbery or extortion, and (2) the defendant's conduct affected interstate commerce. *United States v. Walker*, 657 F.3d 160, 178-79 (3d Cir. 2011); *United States v. Driggs*, 823 F.2d 52, 54 (3d Cir. 1987). Powell challenges the sufficiency of the evidence with respect to the effect on interstate commerce element.[6]

The Hobbs Act was passed as an amendment to the Anti-Racketeering Act of 1934, ch. 569, 48 Stat. 979. The original Act was targeted at extortion by organized crime against store owners and truck drivers. S. Rep. No. 75-1189,

---

[6] We apply a "particularly deferential standard of review" to challenges to the sufficiency of the evidence supporting conviction. *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998). We view all evidence in the light most favorable to the government, and sustain conviction as long as "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *United States v. Voigt*, 89 F.3d 1050, 1080 (3d Cir. 1996)).

8

at 23-24 (1937). But in a later prosecution under the Act against a labor union and twenty-six of its members who coerced tribute from out-of-state truck drivers entering New York City, the Supreme Court held that the Act did not encompass payments for work, even if obtained by threats or violence, and reversed the defendants' convictions. *United States v. Local 807 of Int'l Bhd. of Teamsters*, 315 U.S. 521 (1942). Congress then amended the law to correct the "technical defect in the antiracketeering statute," 91 Cong. Rec. 11,913 (1945) (statement of Rep. Whittington), and "protect interstate commerce and free the highways and streets of this country of robbers," *id.* at 11,912 (statement of Rep. Hobbs); Hobbs Act, ch. 537, 60 Stat. 420 (1946), *codified at* 18 U.S.C. § 1951.

Although the Hobbs Act was framed in the context of racketeering, the Supreme Court has concluded that Congress intended the law to sweep broadly and "prevent anyone from obstructing, delaying, or affecting commerce, or the movement of any article or commodity in commerce by robbery or extortion as defined in the bill." *United States v. Culbert*, 435 U.S. 371, 377 (1978) (emphasis removed) (quoting H.R. Rep. No. 79-238, at 9 (1945)). Based on this legislative history, the Court has declined to read a racketeering requirement into the statute, holding that the statute's words "do not lend themselves to restrictive interpretation" and instead "manifest . . . a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery, or physical violence." *Id.* at 373 (alteration in original) (quoting *Stirone v. United States*, 361 U.S. 212, 215 (1960)).

Consistent with the Court's interpretation of the Hobbs Act's "broad language," *Stirone*, 361 U.S. at 215, we have stressed that "proof of a *de minimis* effect on interstate commerce is all that is required" for conviction under the Hobbs Act. *Walker*, 657 F.3d at 180 (quoting *United States v. Urban*, 404 F.3d 754, 766 (3d Cir. 2005)) (internal quotation marks omitted). Moreover, the effect may be potential, not actual. *United States v. Shavers*, No. 10-2790, slip op. at 11 (3d Cir. Aug. 27, 2012); *United States v. Haywood*, 363 F.3d 200, 209-10 (3d Cir. 2004); *see also Urban*, 404 F.3d at 766-67. We have noted this standard is in accord with the overwhelming weight of authority of our sister circuits. *Urban*, 404 F.3d at 765 n.3. We have also rejected challenges to this standard under the commerce clause jurisprudence outlined in *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000), holding that, because the Hobbs Act contains a jurisdictional element and criminalizes the "fundamentally economic" crimes of robbery and extortion, violations of the Act have a substantial effect on interstate commerce in the aggregate, and the government need not prove a substantial effect in each individual case. *Shavers*, No. 10-2790, slip op. at 11-12, *Walker*, 657 F.3d at 179-80; *Urban*, 404 F.3d at 766; *United States v. Clausen*, 328 F.3d 708, 710-11 (3d Cir. 2003).

Powell challenges the application of the *de minimis* standard in this case. He argues it properly applies only to robberies at business establishments, and that a higher jurisdictional burden applies when, as here, the robbery in question is of an individual in his or her home. For support, he cites cases from our sister circuits finding that the robbery

of a private individual's property away from a place of business did not satisfy the Hobbs Act's jurisdictional element. *See, e.g., United States v. Perrotta*, 313 F.3d 33, 36 (2d Cir. 2002) (extortion of personal funds from a private individual); *United States v. Quigley*, 53 F.3d 909, 910 (8th Cir. 1995) (robbery of personal funds of two individuals en route to a liquor store); *United States v. Collins*, 40 F.3d 95, 100 (5th Cir. 1994) (home robbery of personal property and car). Most notable among this line of cases is *United States v. Wang*, 222 F.3d 234 (6th Cir. 2000), which reversed a conviction under the Hobbs Act for the defendant's robbery of a restaurant owner in her home that secured $4200 in cash, including $1200 from the restaurant's cash register, $900 of which was to be deposited in the restaurant's bank account the next day. The court held the standard for the effect on interstate commerce of the robbery of an individual "is of a different order than in cases in which the victim is a business entity," and ruled that, when the prosecution "seeks to satisfy the Act's jurisdictional nexus by showing a connection between an individual victim and a business engaged in interstate commerce, that connection must be a substantial one—not one that is fortuitous or speculative." *Wang*, 222 F.3d at 238-40. The robbery in question did not satisfy this standard because the robbery was of a private individual in a private home, and there was no evidence of a substantial connection between the robbery and the restaurant's business. *Id.* at 240.

We have addressed this line of cases before. In *Walker*, we noted that, "[e]ven if these decisions are correct," a question we declined to decide, they were distinguishable

11

from the *Walker* facts, which involved the robbery of a drug dealer. 657 F.3d at 181. We interpreted the *Wang* line of cases to stand for the proposition that

> the mere facts that (1) an individual was robbed of personal property, (2) the individual happens to work for a company engaged in interstate commerce, and (3) there was some incidental effect on that person's job performance are insufficient, standing alone, to establish Hobbs Act jurisdiction, because the connection between the robbery and interstate commerce is too attenuated.

*Id.*

Here, as in *Walker*, the link between the robbery and interstate commerce is more direct than in the cases Powell cites. The testimony at trial, viewed in the light most favorable to the government, established that Powell and his accomplices deliberately selected store owners as their victims, seeking to steal the stores' earnings and assets. The robbers decided not to commit the robberies at the stores only because they believed it was too risky. Although we have yet to decide the issue,[7] our sister circuits have held that such targeting satisfies the Hobbs Act's jurisdictional nexus. *See,*

_____

[7] In *Walker*, we suggested in a footnote that because the defendants were "motivated by [the victim's] connection to interstate commerce," the Hobbs Act's jurisdictional nexus was satisfied. 657 F.3d at 182 n.16.

*e.g., United States v. Le*, 256 F.3d 1229, 1237 n.8 (11th Cir. 2001) ("Our conclusion that Le's actions implicated interstate commerce to a degree sufficient to create jurisdiction under the Hobbs Act is based on the fact that Le specifically targeted business assets that were temporarily kept at a private residence which, if stolen, had the potential to delay or obstruct the purchase of products from another state."); *United States v. Diaz*, 248 F.3d 1065, 1088-89 (11th Cir. 2001) ("What sets this case apart is the fact that the role of the Martins with regard to their business, which was directly engaged in interstate commerce, was not coincidental. Rather, the Court is convinced by the evidence presented at trial that appellants targeted the Martins because of their interest in Rosa Medical Center." (emphasis removed)); *United States v. Nguyen*, 246 F.3d 52, 54 (1st Cir. 2001) (jurisdictional nexus met in home robbery because "the evidence clearly shows that the conspirators planned to steal the earnings of a business in interstate commerce."). Such targeting also likely satisfies the standards outlined in *Wang* and similar cases as an instance when the robbery of an individual nonetheless affects interstate commerce. *See Perrotta*, 313 F.3d at 37-38 ("The [Hobbs Act's] jurisdictional nexus could be satisfied by showing that the victim directly participated in interstate commerce; that the victim was targeted because of her status as an employee at a company participating in interstate commerce; that the harm or potential harm to the individual would deplete the assets of a company engaged in interstate commerce; [or] that the crime targeted the assets of a business rather than an individual.") (citations omitted); *Wang*, 222 F.3d at 240 ("[T]he Government might make such a showing

13

[of a robbery's substantial connection to interstate commerce] by demonstrating that the defendant knew of or was motivated by the individual victim's connection to interstate commerce."); *Collins*, 40 F.3d at 100 ("Criminal acts directed toward individuals may violate section 1951(a) only if: (1) the acts deplete the assets of an individual who is directly and customarily engaged in interstate commerce; (2) if the acts cause or create the likelihood that the individual will deplete the assets of an entity engaged in interstate commerce; or (3) if the number of individuals victimized or the sum at stake is so large that there will be some 'cumulative effect on interstate commerce.'" (citations omitted)).

Despite this line of cases, Powell argues that what he terms the "targeting theory" is inapposite. He asserts that, because nearly every robbery targets moneys or goods obtained in interstate commerce, the theory collapses any jurisdictional limit on the Hobbs Act's reach. Next, in a contention advanced primarily at oral argument, he suggests that the targeting theory's focus on intent may be appropriate for a Hobbs Act conspiracy or attempt charge, where the effect on commerce may only be potential, but is misapplied to the substantive charge, which purportedly requires an actual effect on interstate commerce for conviction.

We find these arguments unconvincing. As to the first contention, Powell's description of a robbery targeted at money and goods coincidentally obtained in interstate commerce is not the sort of targeting at issue here. Powell did not rob his victims merely because he believed they had money or valuables, and these items happened to come from

14

interstate commerce, as Powell's hypotheticals posit. The link to commerce was more direct: Powell specifically targeted the proceeds of businesses engaged in interstate commerce. Accordingly, although they took place outside the confines of the victims' stores, the robberies here were nonetheless "directed at a business establishment," which Powell concedes lies within Hobbs Act jurisdiction. Br. for Appellant at 17. Targeting of this sort satisfies the Hobbs Act's jurisdictional nexus.

The second argument misstates circuit law. As noted, we have held that the effect on interstate commerce required for a Hobbs Act conviction need only be "potential," and have never limited this standard solely to convictions for Hobbs Act conspiracy. *See Urban*, 404 F.3d at 765-66 & n.3 (endorsing, after a lengthy discussion, the use of the "potential" effect on commerce standard in "the context of substantive Hobbs Act cases"); *Haywood*, 363 F.3d at 209-10 (citing precedent that the effect on commerce need only be potential in upholding a conviction for a substantive Hobbs Act violation). We have also observed that, although some circuits have adopted a requirement of an actual effect in substantive cases, *see, e.g.*, *United States v. Williams*, 308 F.3d 833, 838 (8th Cir. 2002); *United States v. Carcione*, 272 F.3d 1297, 1300-01 n.5 (11th Cir. 2001), the weight of authority endorses the position we have adopted, *see Urban*, 404 F.3d at 766 n.3 (collecting cases).

Conviction under the Hobbs Act does not require proof that the defendant intended to affect interstate commerce. *See* Third Circuit Model Criminal Jury Instructions § 6.18.1951-7

15

(2010). But the defendant's intent is nonetheless relevant, because the government may establish the jurisdictional nexus by demonstrating that the "natural consequences" of the robbery would result in an effect on interstate commerce, *Urban*, 404 F.3d at 762, and intent is probative, although not dispositive, on this question. Here, Powell deliberately sought to rob business owners to obtain proceeds of businesses engaged in interstate commerce. This targeting and the resultant robberies of those owners were sufficient for a rational jury to conclude beyond a reasonable doubt that the "natural consequences" of Powell's actions were an actual or potential effect on interstate commerce.

There was also sufficient evidence to sustain Powell's conviction under what we have termed "the depletion of the assets" theory, "whereby proof that a Hobbs Act violation depletes the assets of a business engaged in interstate commerce conclusively establishes the effect on commerce requirement." *Urban*, 404 F.3d at 762. In *Urban*, we comprehensively surveyed our precedent, as well as that of our sister circuits, and found repeated and unequivocal endorsement of the application of this standard to Hobbs Act violations. *Id.* at 763-66 & n.3; *see also Haywood*, 363 F.3d at 210; *United States v. Cerilli*, 603 F.2d 415, 423-24 (3d Cir. 1979); *United States v. Mazzei*, 521 F.2d 639, 642-43 (3d Cir. 1975) (en banc). Our sister circuits have specifically applied the theory to uphold Hobbs Act convictions for home robberies that seized business assets. *See United States v. Jimenez-Torres*, 435 F.3d 3, 9 (1st Cir. 2006) ("Depletion of the assets of a business engaged in interstate commerce is a common method for demonstrating that a robbery had an

16

effect on interstate commerce. This is so even if the business's assets were stolen from a home." (citation omitted)).

The undisputed evidence at trial established that Powell and his accomplices stole business assets in both robberies: approximately $2300 from Star Wigs,[8] and $140 and credit card receipts from Dollar Plus. Although the amount taken in the Dollar Plus robbery was comparatively small, we have never suggested that a robbery can affect commerce only if a substantial amount of a business's assets are stolen. *See Walker*, 657 F.3d at 180 (rejecting argument that robbery of drug dealer of $60 in cocaine and $40-$50 in cash did not affect interstate commerce because "we have found the *de minimis* standard satisfied in similarly low-stakes robberies"); *Haywood*, 363 F.3d at 211 & n.7 (upholding a Hobbs Act conviction based on depletion of assets because of theft of $50-$70 in cash from a bar). Viewing the evidence in the light most favorable to the government, there was sufficient evidence to find beyond a reasonable doubt that the theft of business assets in the two robberies had an actual or potential *de minimis* effect on interstate commerce.

In sum, the circumstances of this case—where the

---

[8] Consistent with our standard of review, we construe the dispute over the amount taken in the Y.B. robbery in the light most favorable to the government. But our conclusion would be the same if the robbery had only netted $1060 in business proceeds.

evidence established that Powell and his accomplices targeted interstate businesses and stole business proceeds—support a rational jury's conclusion that the Hobbs Act's jurisdictional nexus was satisfied beyond a reasonable doubt. The fact that the robbers believed it would be easier and more profitable to commit their crimes at business owners' homes, rather than in the stores they owned, cannot be read to negate the robberies' effect on interstate commerce and defeat otherwise available federal jurisdiction.

**B.**

Powell also challenges the District Court's jury instructions with respect to the interstate commerce prong of a Hobbs Act violation.[9] At trial, the government proposed the Third Circuit model jury instruction for the required Hobbs Act element of effect on interstate commerce that read:

> The third element that the government must prove beyond a reasonable doubt is that *(name)*'s conduct affected or could have affected interstate commerce. Conduct affects interstate commerce if it in any way interferes

[9] We review a district court's refusal to give a certain instruction for abuse of discretion, but exercise plenary review to determine whether the jury instructions stated the proper legal standard. *United States v. Leahy*, 445 F.3d 634, 642 (3d Cir. 2006). We consider the jury instructions as a totality and do not evaluate particular sentences or paragraphs in isolation. *Id.*

with, changes, or alters the movement or transportation or flow of goods, merchandise, money, or other property in commerce between or among the states. The effect can be minimal.

It is not necessary to prove that *(name)* intended to obstruct, delay or interfere with interstate commerce or that the purpose of the alleged crime was to affect interstate commerce. Further, you do not have to decide whether the effect on interstate commerce was to be harmful or beneficial to a particular business or to commerce in general. You do not even have to find that there was an actual effect on commerce. All that is necessary to prove is that the natural consequences of the offense potentially caused an effect on interstate commerce to any degree, however minimal or slight.

Third Circuit Model Criminal Jury Instructions § 6.18.1951-7 (2009). The government also proposed an additional paragraph describing the depletion of the assets theory endorsed in *Urban*, 404 F.3d at 763-67.[10] Powell objected

---

[10] That paragraph read:

You can, but are not required to, find an effect on interstate commerce if the defendant's actions reduced the assets of a business engaged or purchasing goods or services in interstate commerce, which assets would otherwise have

19

and proposed an alternate instruction that would require the jury to find a substantial connection between the individual robbed and a business engaged in interstate commerce for conviction.[11]  The District Court charged the jury with the instruction as proposed by the government.

The District Court did not abuse its discretion in rejecting Powell's proposed instruction.  The instruction given reflected circuit precedent by requiring the government to prove beyond a reasonable doubt an actual or potential *de minimis* effect on interstate commerce for conviction.  We interpret the addition of the "depletion of the assets" paragraph not to supplant or expand the standard outlined in the model instruction, but to exemplify one way the required nexus can be established.  *See Walker*, 657 F.3d at 183 ("[W]hile the government can and often will rely upon the

---

> been available for conducting the purchase of such goods or services in interstate commerce.

App. for Appellant at 561a.

[11] Powell's proposed instruction read, in relevant part:

> Where the robbery is of an individual in his or her home, and the Government seeks to prove an effect on interstate commerce by showing a connection between an individual victim and a business engaged in interstate commerce, that connection must be a substantial one – not one that is fortuitous or speculative.

App. for Appellant at 562a.

20

depletion of assets theory, it is only required to present evidence proving that the 'defendants' conduct produces any interference with or effect upon interstate commerce, whether slight, subtle, or even potential.'" (quoting *Haywood*, 363 F.3d at 209-10)).   Here, as in *Urban* and *Haywood*, the application of the theory is unproblematic.

In declining to explicitly require a substantial connection between the robbery of an individual and interstate commerce for conviction under the Hobbs Act, we do not suggest that Hobbs Act jurisdiction is limitless.  Our precedent has underscored the concern that the prevalence of interstate commerce in our modern society could elevate garden-variety street crime to federal Hobbs Act offenses, thereby "supplanting the state criminal systems that quite ably address classic state-law crimes."  *Walker*, 657 F.3d at 184; *see also Jimenez-Torres*, 435 F.3d at 7-8 ("Where . . . the crime concerns the robbery of a home rather than of a business, we approach the task of applying the de minimis standard with some caution, lest every robbery (which by definition has some economic component) become a federal crime.").  Like the *Wang* line of cases, we would likely find problematic Hobbs Act prosecutions for robberies that "cause[] only a speculative indirect effect on a business engaged in interstate commerce," 222 F.3d at 238; *cf. United States v. McGuire*, 178 F.3d 203, 209-12 (3d Cir. 1999) (finding insufficient evidence of effect of interstate commerce under 18 U.S.C. § 844, the federal arson statute, where defendant blew up a car containing a bottle of orange juice that had traveled in interstate commerce and was intended for a local catering business).

But this case demonstrates the contrary hazard in adopting a bright-line rule that sharply differentiates a home from business premises for the purposes of Hobbs Act jurisdiction. As discussed, the facts of this case, where robbers targeted two businesses engaged in interstate commerce to obtain their proceeds, place it within Hobbs Act jurisdiction. This case differs from the typical Hobbs Act prosecution of a business holdup only because the robbers elected to rob business owners at their homes, not in their stores. The critical question under the Hobbs Act is the robbery's effect on interstate commerce; where the robbery occurs is but one factor in assessing this issue. *See Carcione*, 272 F.3d at 1301 n.6 ("[I]n determining whether there is a minimal effect on commerce [under the Hobbs Act], each case must be decided on its own facts." (quoting *United States v. Rodriguez*, 218 F.3d 1243, 1245 (11th Cir. 2000))).

In short, the District Court's instruction accurately stated circuit law on the Hobbs Act's jurisdictional nexus.

**III.**

For the foregoing reasons, we will affirm the judgment of conviction and sentence.

22