**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.                                No. 11-4819

CARTER TILLERY,
            *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
James R. Spencer, District Judge.
(3:10-cr-00223-JRS-1)

Argued: October 24, 2012

Decided: December 19, 2012

Before WILKINSON, GREGORY, and DUNCAN,
Circuit Judges.

Affirmed by published opinion. Judge Gregory wrote the opinion, in which Judge Wilkinson and Judge Duncan joined.

**COUNSEL**

**ARGUED:** Charles D. Lewis, Richmond, Virginia, for Appellant. Jessica Aber Brumberg, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. **ON BRIEF:** Vaughan C. Jones, JOHNSON &

JONES, LLP, Richmond, Virginia, for Appellant. Neil H. MacBride, United States Attorney, Alexandria, Virginia, for Appellee.

---

**OPINION**

GREGORY, Circuit Judge:

Carter Tillery appeals his jury conviction of a Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a), and using, carrying, and brandishing a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). He also challenges his sentence, arguing he was improperly sentenced as a career offender. For the following reasons, we affirm.

I.

On the morning of August 1, 2009, the Petersburg, Virginia branch of Swan Dry Cleaners was robbed at gun-point. An unmasked man entered Swan Dry Cleaners and approached Anna Cho, the only employee working at the time. He brandished a firearm, stole Cho's personal computer, and emptied $40-$100 from the cash register. He ordered Cho to the back of the store and directed her to strip to her underwear and kneel on the ground while he used a telephone cord to tie her hands.[1] The robber went to the front of the store and then returned to where Cho was located wearing a ski mask. He told Cho to count to 100 and afterwards call the police. In the interim, the robber fled the store. In total, the robber was in Swan Dry Cleaners for approximately ten to fifteen minutes.

Once the robber left the store, Cho freed herself and ran to the barbershop next-door for help. A barber called the police and when the police arrived they took Cho's statement. Cho

---

[1]DNA samples taken from the cord proved inconclusive.

described the robber as a six-foot tall black male with a slim build and short hair. She said he possibly had facial hair and might have been wearing glasses.[2] Cho also believed her assailant either had "some missing teeth in the front" or that there was a "large gap between his teeth," and in her opinion, had a dark complexion for an African American.

Later that month, a man came into the barbershop and sold a laptop for $150 to the barbershop owner, Derrick Pulliam. Pulliam had seen the seller on two prior occasions. In September, Petersburg police officer Detective Harris investigated reports that a laptop had been sold at the barbershop. Pulliam presented the laptop to Detective Harris, who discovered it was the same laptop stolen from Cho. Detective Harris showed Pulliam a sequential photo array of potential persons who might have sold him the laptop, and Pulliam identified Carter Tillery from the array. Two days later, Detective Harris returned the laptop to Cho and showed her the same photo array, from which she identified Tillery as the robber.[3]

In mid-December 2009, spurred by confidential information, Detective Harris went to two adjacent motels in Prince George County. One motel was operational while the other was not. Detective Harris found two shotguns in the defunct motel,[4] and learned that Tillery resided at the adjacent operational motel from March to August 2009. At the time of the search Tillery was incarcerated for unrelated charges.

In June 2010, while still incarcerated for unrelated charges, Tillery spoke to his cellmate, Jason Pullery, about the robbery. In shocking detail, Tillery told Pullery that he robbed a

---

[2]Cho later testified that the perpetrator was *not* wearing glasses.

[3]Cho further identified Tillery as the robber at a February 2010 preliminary hearing and during the December 2010 trial.

[4]Tillery's DNA was not found on the firearms. Cho testified that one of the guns found was consistent with the gun used in the course of the robbery, although she was not sure if it was the same gun.

dry cleaners, forced the only female clerk working at the time to strip, stole her laptop, and later sold the laptop at a barbershop. Tillery also told Pullery that he used a sawed-off shotgun in the course of the robbery, hid the gun in a "shut-down hotel," and later sent his brother to wipe any fingerprints off the shotgun.

Based on this information, a grand jury indicted Tillery on August 4, 2010, on two counts: (1) Hobbs Act robbery affecting interstate commerce in violation of 18 U.S.C. § 1951(a); and (2) using, carrying, and possessing a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). Tillery was arrested pursuant to the indictment on August 12, 2010.[5] On December 14 and 15, 2010, a jury trial was held and Tillery was convicted of both counts. And on August 1, 2011, Tillery was sentenced to 240 months for the robbery and 120 months for the firearms charge to run consecutively for a total of 360 months, followed by five years of supervised release. Tillery now appeals both his conviction and his sentence.

## II.

First, Tillery challenges the jurisdictional element of his Hobbs Act robbery conviction. He argues that because he only stole $40-$100 from Swan Dry Cleaners that the robbery in question did not have a "minimal effect" on interstate commerce. Second, he submits that even if the jurisdictional element is satisfied, there was insufficient evidence for the jury to find him guilty of the offense.

## A.

The Hobbs Act prohibits robbery or extortion that "in any way or degree obstructs, delays, or affects commerce or the

---

[5]On October 19, 2010, the grand jury returned a superseding indictment alleging the same two counts with minor changes to the pleadings.

movement of any article or commodity in commerce." 18 U.S.C. § 1951(a). Thus, the two elements of a Hobbs Act crime are: (1) robbery or extortion, and (2) interference with commerce. *Stirone v. United States*, 361 U.S. 212, 218 (1960). And because "Congress exercised the full extent of [its] authority . . . to punish interference with interstate commerce," we have held that the Hobbs Act's jurisdictional predicate is satisfied where the instant offense has a "minimal effect" on interstate commerce. *United States v. Williams*, 342 F.3d 350, 354 (4th Cir. 2003) (citing *United States v. Spagnolo*, 546 F.2d 1117, 1119 (4th Cir. 1976)).

Our precedent is clear—a robbery has a "minimal effect" on interstate commerce when it depletes the assets of an "inherently economic enterprise." *See Williams*, 342 F.3d at 355; *United States v. Buffey*, 899 F.2d 1402, 1404 (4th Cir. 1990). When determining whether a robbery had a minimal effect on interstate commerce, we do not look at the impact of the immediate offense, but "whether the relevant class of acts has such an impact." *Williams*, 342 F.2d at 355 (citing *United States v. Marrero*, 299 F.3d 653, 655 (7th Cir. 2002)). The impact on commerce may be shown by "proof of probabilities without evidence that any particular commercial movements were affected." *United States v. Brantley*, 777 F.2d 159, 162 (4th Cir. 1985).

The government put on more than enough evidence to show Swan Dry Cleaners had an interstate commerce connection. The branch which Tillery robbed was part of a larger network of cleaners. For the enterprise as a whole to operate, Swan Dry Cleaners had to purchase most of its supplies from out-of-state, which included purchasing cleaning solvents from Illinois; hangers from Alabama, Mexico, Vietnam, and China; spotting chemicals from Illinois and Missouri; gown boxes from Illinois; detergent from North Carolina; starch from Missouri; boiler conditioner from Illinois; and plastic garment bags from South Carolina. Additionally, there was testimony that the Petersburg branch used an out-of-state

credit card processor and telephone company. Viewed in the aggregate, it is clear that robbing a place of business, especially Swan Dry Cleaners—which necessarily relies on out-of-state suppliers to operate—has an interstate commerce connection. Therefore, when Mr. Tillery stole money from Swan Dry Cleaners' cash register, depleting an inherently economic enterprise of its assets, the Hobbs Act jurisdictional requirement was satisfied.

This finding is consistent with our previous holdings. We held in *United States v. Singleton* that a "business that purchase[s] a substantial portion of its inventory . . . from out-of-state suppliers" is engaged in interstate commerce for purposes of the Hobbs Act. 178 F. App'x 259, 262 (4th Cir. 2006) (unpublished); *accord United States v. Guerra*, 164 F.3d 1358, 1361 (11th Cir. 1999) (holding that robbery of $300 from a branch store that was part of a national chain that purchased its inventory from out-of-state satisfied the Hobbs Act's jurisdictional element). There is also a much stronger nexus with interstate commerce in this instance than in some of our prior holdings in which we have found the Hobbs Act's jurisdictional requirement was satisfied. *See, e.g.*, *Williams*, 342 F.3d at 355 (robbing a drug dealer affects interstate commerce); *United States v. Mohamadi*, 461 F. App'x 328, 335-36 (4th Cir. 2012) (unpublished) (robbing a prostitute affects interstate commerce). By comparison, it would violate the principles of common sense to find that robbing a legitimate place of business would not have even a minimal effect on interstate commerce, especially when we have to view such activities in the aggregate.

Tillery raises a number of policy arguments as to why the Court should not find the robbery met the jurisdictional requirement. But ultimately, policy does not trump precedent. Tillery argues that the small amount of money stolen from Swan Dry Cleaners cannot be said to have had even a minimal effect on interstate commerce. We have never held, however, that the depletion of assets theory has a dollar-amount

minimum. We only look at whether an inherently economic enterprise is depleted of its assets, not at the amount of assets depleted. Tillery further argues that if the Court finds the robbery in question affected interstate commerce that every time a place of business is robbed the perpetrator could be prosecuted under the Hobbs Act. While we find it unnecessary to reach this hypothetical, we do reiterate that Congress exercised its broad and far-reaching Commerce Clause powers when passing the Hobbs Act. While some robberies prosecuted under the Hobbs Act may essentially be "state crimes" better prosecuted at the state level, we are not policy-makers nor do we have power over prosecutorial efficiency. We only look at whether the jurisdictional predicate is satisfied, which in this case it undoubtedly was.

## B.

Tillery also argues there was not enough evidence to support his conviction. In reviewing the sufficiency of the evidence, we construe "the evidence in the light most favorable to the government and inquire whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt." *United States v. Lentz*, 383 F.3d 191, 199 (4th Cir. 2004) (internal citation and quotation marks omitted). Tillery's argument centers on Ms. Cho's conflicting statements about his appearance, and the fact that her in-trial identification was allegedly central to the jury finding that he was guilty.[6] Tillery's argument belies the record.

---

[6]Specifically, Tillery cites that Cho said her assailant had short hair and a "widow's peak," while Tillery had corn-rows; Cho said her assailant was "six-foot one or six-foot two," while Tillery is five-foot ten inches tall; Cho said her assailant had a dark complexion, while Tillery has a light complexion; Cho gave conflicting testimony on whether her assailant was wearing glasses; and Cho only saw her assailant for less than 10 minutes, during which she often had her back to him. Tillery also points to the fact that over a year transpired between the robbery and Cho's in-court identification.

Tillery ignores the fact that Cho identified him on two other occasions outside of trial—from a sequential photo array the same month of the robbery and again at the preliminary hearing. Even without Cho's identification, Tillery leaves out that barbershop owner Derrick Pulliam identified Tillery as selling him Cho's stolen laptop. Moreover, Tillery completely overlooks the damning testimony of his cellmate Jason Pullery, to whom he confessed the entire robbery in excruciating detail. There is more than enough evidence on the record to support Tillery's conviction.

## III.

Tillery next challenges the district judge's delivery of the jury instructions. Because Mr. Tillery did not object to the jury instructions at trial, we review the instructions for plain error. *Puckett v. United States*, 556 U.S. 129, 135 (2009); *see also United States v. Wallace*, 515 F.3d 327, 332 (4th Cir. 2008). Tillery argues that the district judge's instructions "clearly left the jurors with the impression that anything short of a unanimous verdict would reflect negatively on the competency of their deliberations." Appellant's Br. 18-19. Specifically, he quarrels with the district judge's admonishment that a mistrial would be "very bad . . . you all would go home but I would have to do this again. That would be very bad." Tillery contends that this statement "encouraged jurors to surrender personal convictions to the will of the majority." *Id.*

To be sure, certain instructions may go "beyond the permissible limits to which a court may go in its endeavor to influence the jury toward the rendition of a verdict." *United States v. Mitchell*, 720 F.2d 370, 372 (4th Cir. 1983) (internal citation and quotation marks omitted). As such, jury instructions in which the district judge overemphasizes the importance of unanimity have troubled us in the past. *See, e.g.*, *United States v. Rogers*, 289 F.2d 433, 435 (4th Cir. 1961); *United States v. Sawyers*, 423 F.2d 1335, 1342-43 (4th Cir. 1970). But when reviewing jury instructions, we do not "view a single instruc-

tion in isolation." *United States v. Lighty*, 616 F.3d 321, 366 (4th Cir. 2010). We view an allegedly erroneous instruction in its full context. *Id.*

In the case at hand, it is not clear that the instruction now objected to by Tillery was erroneous. When the challenged instruction is read in its context, the district judge told the jury "to never tell us how you stand," as *that* would result in a mistrial. This instruction was in accordance with our ruling in *United States v. Penniegraft*, where we asserted that "[u]nquestionably, it is plain error for a trial judge to inquire as to the numerical division of a jury." 641 F.3d 566, 575 (4th Cir. 2011). While the district judge may have taken some liberties when delivering the jury instructions, based on our reading of the record he did not commit plain error.

## IV.

Tillery finally argues that he was improperly sentenced as a career offender under the *United States Sentencing Commission Guidelines Manual*. *See* U.S.S.G. § 4B1.1(a). Under § 4B1.1(a), a defendant qualifies as a career offender if, among other things, "the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense." *Id.* The district court found that Tillery had two qualifying prior convictions for crimes of violence: robbery and use of a firearm in the commission of a felony, and eluding police. Tillery argues that eluding police is not a crime of violence, and therefore the district court erred by including this conviction when determining whether he qualified as a career offender.

We recently held in *United States v. Hudson* that "intentional vehicular flight *in any manner* poses a potential level of risk that is sufficient to render the offense a violent felony." 673 F.3d 263, 268 (4th Cir. 2012) (emphasis in the original). The *Hudson* Court reached this conclusion by extending the rationale employed by the Supreme Court in *Sykes v. United*

*States*, in which the Court held that Indiana's felony vehicular flight statute constitutes a crime of violence, as "[r]isk of violence is inherent to vehicle flight." 131 S. Ct. 2267, 2274 (2011). Based on *Sykes*, the *Hudson* Court concluded intentional vehicular flight from law enforcement necessarily encompasses an "inherent risk" of violence. *Hudson*, 673 F.3d at 268.

To be found guilty under Virginia's eluding police statute a person must willfully and wantonly disregard a police officer's signal while driving. *See* Va. Code Ann. § 46.2-817. Because Virginia's statute requires intentional vehicular flight from a police officer, *Hudson*'s rationale controls. Prior to *Hudson*, Tillery may have had a viable argument that Virginia's eluding police statute differed from the Indiana statute interpreted by the Supreme Court in *Sykes*; this argument was foreclosed by our holding in *Hudson*.

V.

In accordance with the foregoing, we affirm Carter Tillery's conviction and sentence.

*AFFIRMED*