**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-4316

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DAVID ANTHONY TAYLOR,

Defendant - Appellant.

Appeal from the United States District Court for the Western District of Virginia, at Roanoke. Glen E. Conrad, Chief District Judge. (7:12-cr-00043-GEC-1)

Argued: May 15, 2014          Decided: June 6, 2014

Before WILKINSON and THACKER, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Thacker and Senior Judge Hamilton joined.

**ARGUED:** Kari Elizabeth Jackson, Dennis Jones, DENNIS E. JONES & ASSOCIATES, Abingdon, Virginia, for Appellant. Jean Barrett Hudson, OFFICE OF THE UNITED STATES ATTORNEY, Charlottesville, Virginia, for Appellee. **ON BRIEF:** Timothy J. Heaphy, United States Attorney, Roanoke, Virginia, Anne H. Lippitt, Third Year Law Student, OFFICE OF THE UNITED STATES ATTORNEY, Charlottesville, Virginia, for Appellee.

WILKINSON, Circuit Judge:

David Anthony Taylor appeals his convictions for two counts of Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) and one count of using a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c). Taylor contends both that the government failed to introduce sufficient evidence to establish that his robberies affected interstate commerce and that the district court erred in prohibiting him from showing that the particular drugs he was seeking to steal did not affect interstate commerce. Pursuant to Supreme Court precedent supporting the broad ability of Congress to punish the disruption of interstate commerce and our own conforming decisions in United States v. Tillery, 702 F.3d 170 (4th Cir. 2012), and United States v. Williams, 342 F.3d 350 (4th Cir. 2003), we affirm his convictions.

I.

A.

Taylor was a member of the "Southwest Goonz," a group of robbers led by George Fitzgerald and based in Roanoke, Virginia. The Goonz focused on robbing drug dealers because they typically have drug proceeds in their homes and, because of the illegal nature of their activities, they are reluctant to report crime to the authorities. Taylor persuaded Fitzgerald to take him on

2

several planned home invasions in order to steal drugs and drug proceeds, such as money and jewelry.

One of these break-ins was planned for the residence of Josh Whorley, where his girlfriend Latasha Graham and her two children also lived. Fitzgerald chose Whorley's home because he had learned that Whorley sold an exotic and high grade of marijuana, a belief that he communicated to Taylor and two other group members. The robbers expected to find both drugs and money there.

Their expectations were not unreasonable, because Whorley had both used and sold drugs in the past. Graham herself was a regular marijuana user. Additionally, Whorley's house had been broken into twice prior to the August 27, 2009 robbery, and a housemate had been held at gunpoint in the driveway.

Taylor and his associates robbed Whorley's house on the night of August 27. The four robbers kicked in the front door and held guns to Whorley and Graham while searching the house. During the robbery, Taylor hit Graham in the head with his pistol, groped her, and clawed the rings off her fingers. Whorley was also repeatedly struck by one of the robbers. The robbers demanded that Graham tell them where the money and marijuana were located. All in all, the robbers made off with Graham's jewelry, $40 from her purse, two cell phones, and a marijuana cigarette.

3

Another break-in was planned for the home of William Lynch, who lived together with his wife, Whitney Lynch, and their three children. Fitzgerald chose Lynch's home because he had been told by a previously reliable source that Lynch sold marijuana. The source further informed Fitzgerald that on a prior occasion he had personally robbed Lynch, also known as "W.T.," of twenty pounds of marijuana. Lynch surrounded himself with people who used and possessed drugs. Taylor and Fitzgerald both expected to recover marijuana and drug proceeds during the home invasion.

The Goonz robbed Lynch's residence on October 21, 2009. Taylor initiated the robbery by knocking on the front door. After he entered the home, Fitzgerald and another group member followed. Once inside, Taylor held Lynch and his six-year old son at gunpoint in the living room, while another robber forced Lynch's nine-year old daughter from her bedroom into the living room. Fitzgerald asked Lynch to tell him where the marijuana was located. Lynch insisted that he did not have it and claimed that it was in another man's possession. Whitney Lynch emerged from her bedroom at the sound of the commotion and was assaulted by a robber, who attempted to remove her pants. She struggled with him while he demanded that she show him where the money and drugs were located. She was then dragged into the living room by her hair. The three robbers eventually took Lynch's cell phone and departed.

4

B.

On July 26, 2012, Taylor was indicted by a grand jury in the Western District of Virginia on two counts of Hobbs Act robbery under 18 U.S.C. § 1951(a) and two counts of using a firearm in furtherance of a crime of violence under 18 U.S.C. § 924(c). Taylor's first trial resulted in a hung jury.

A second trial was conducted from January 23 to 25, 2013. Before the second trial commenced, the government moved to preclude Taylor from offering evidence that robbing a drug dealer who sells marijuana grown within the borders of Virginia does not affect interstate commerce and thus does not violate the Hobbs Act. Taylor filed a Motion to Dismiss, contending that such a ruling would violate his constitutional right to present a complete defense. The district court held a hearing after which it granted the government's motion on the grounds that the enterprise of drug dealing affects interstate commerce as a matter of law under United States v. Williams, 342 F.3d 350 (4th Cir. 2003). See also United States v. Tillery, 702 F.3d 170, 175 (4th Cir. 2012) (upholding conviction for Hobbs Act robbery of a business because it impacted interstate commerce "in the aggregate").

On January 25, the jury convicted Taylor on three of the four counts in the indictment, including both of the Hobbs Act offenses. With regard to the Hobbs Act crimes, the jury found

5

Taylor guilty of "knowingly and unlawfully taking and obtaining, or attempting to take or obtain, by robbery, items having an effect on interstate commerce by means of actual and threatened force, violence, and fear of injury." J.A. 702. Taylor moved to set aside the verdict on the basis that the government had not offered evidence that Taylor's actions had affected interstate commerce. The district court denied Taylor's motion. The court then sentenced Taylor to 336 months in prison followed by supervised release for three years. Taylor now appeals.

## II.

Taylor argues that the government failed to present sufficient evidence that his robberies affected interstate commerce under the Hobbs Act. He also contends that the district court erred in prohibiting him from showing that his robberies of dealers of Virginia-grown marijuana likely did not impact interstate commerce.

### A.

We note at the outset the extraordinary breadth and reach of the Hobbs Act. That law reads, in pertinent part:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be [punished].

6

18 U.S.C. § 1951(a).  A Hobbs Act crime, then, has two elements: "(1) robbery or extortion, and (2) interference with commerce." Tillery, 702 at 174.  With regard to the second element, it is impossible to ignore Congress' repeated use of the word "any." Indeed, the Supreme Court has recognized that the Hobbs Act "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce . . . ." Stirone v. United States, 361 U.S. 212, 215 (1960).  Thus, the jurisdictional predicate of the Hobbs Act requires only that the government prove a "minimal" effect on interstate commerce.  United States v. Spagnolo, 546 F.2d 1117, 1119 (4th Cir. 1976).

Such an impact is not difficult to show.  The effect may be so minor as to be de minimis, United States v. Buffey, 899 F.2d 1402, 1404 (4th Cir. 1990), and may be demonstrated by "proof of probabilities," United States v. Brantley, 777 F.2d 159, 162 (4th Cir. 1985).  Moreover, the government is not required to prove that the "defendant intended to affect commerce or that the effect on commerce was certain; it is enough that such an effect was the natural, probable consequence of the defendant's actions." Williams, 342 F.3d at 354.

To determine whether a robbery affects commerce, we do not simply examine the effect of the individual action in question;

7

it is sufficient that the "relevant class of acts" has a measureable impact on interstate commerce.  Tillery, 702 F.3d at 174 (internal quotation marks omitted).  Considering the class of activities in the aggregate in order to determine whether they impact interstate commerce is nothing new.  The Supreme Court has repeatedly found that Congress may regulate conduct under the Commerce Clause that, in the aggregate, impacts interstate commerce.  See, e.g., Gonzales v. Raich, 545 U.S. 1, 18-19, 22 (2005) (holding that Congress may regulate intrastate marijuana market because of its aggregate impact on interstate commerce); Wickard v. Filburn, 317 U.S. 111, 128-29 (1942) (finding that Congress is permitted to regulate activities that, when "taken together with th[ose] of many others similarly situated," have an effect on interstate commerce).

We have likewise recognized that, because the Hobbs Act reflects the full breadth of Congress' commerce power, the aggregation principle applies in the Hobbs Act context.  See Tillery, 702 F.3d at 174-75; Williams, 342 F.3d at 355.  Indeed, to focus exclusively on an individual act would wholly undermine Congress' purpose in adopting the Hobbs Act: to protect commercial, interstate activity from criminal disruption.  See United States v. Culbert, 435 U.S. 371, 373 (1978) (finding that the words of the Hobbs Act "do not lend themselves to restrictive interpretation").

8

In so ruling, we note the large number of circuits that agree that the aggregation principle applies in the context of a Hobbs Act violation. See United States v. Powell, 693 F.3d 398, 402 (3d Cir. 2012) ("[B]ecause the Hobbs Act contains a jurisdictional element and criminalizes the 'fundamentally economic' crimes of robbery and extortion, violations of the Act have a substantial effect on interstate commerce in the aggregate, and the government need not prove a substantial effect in each individual case.") (citations omitted); United States v. Robinson, 119 F.3d 1205, 1214 (5th Cir. 1997) (same); United States v. Davis, 473 F.3d 680, 683 (6th Cir. 2007) (same); United States v. Marrero, 299 F.3d 653, 655 (7th Cir. 2002) (same); United States v. Bolton, 68 F.3d 396, 399 (10th Cir. 1995) (same); United States v. Guerra, 164 F.3d 1358, 1361 (11th Cir. 1999) (same). "Any other rule would leave the federal government helpless to deal with criminal acts that have an individually trivial but cumulatively significant effect on the movement of goods and services across state and international boundaries." United States v. Thomas, 159 F.3d 296, 298 (7th Cir. 1998).

The requirement that the precise effect on commerce be traced in each and every case would not only damage the aggregation principle and the class of acts principle that underlies it; it would also raise concerns of practicality which

9

militate against a requirement of showing every charged crime's precise commercial effect. See Marrero, 299 F.3d at 655 ("Nor is it necessary that the individual criminal act . . . be shown to have a measurable impact on commerce, which would usually be impossible to show. It is enough if the class of acts has such an impact."). To the extent that United States v. Needham, 604 F.3d 673 (2d Cir. 2010), is in tension with our holding, we note simply the observation of Judge Cabranes that "'commerce' for purposes of the Hobbs Act -- that is, 'commerce over which the United States has jurisdiction,' 18 U.S.C. § 1951(b) -- encompasses marijuana that is grown, processed, and sold entirely within a single state." Id. at 688 (Cabranes, J., dissenting in part and concurring in part). If there is to be a "marijuana exception" to traditional Hobbs Act principles, that is a policy choice for the Congress to make. Until it does, we shall follow the plain lessons of Supreme Court cases and our own precedent, which must of necessity govern our disposition of this case.

It is of no relevance that the market for a certain commodity may be illegal. The jurisdictional predicate in the Hobbs Act speaks of "commerce," not just "legal" or "legitimate" commerce, and commerce is well understood to encompass unlawful transactions. See Raich, 545 U.S. at 18-19 (holding that the Commerce Clause empowers Congress to regulate and criminalize

10

the national market for marijuana). Drug dealing is a commercial enterprise and robberies of drug dealers threaten that enterprise; that is enough for a federal court to exercise jurisdiction under the Hobbs Act. See Williams, 342 F.3d at 354 (finding that "robberies of drug dealers . . . impact[] a trade that plainly is both economic and interstate in character").

Finally, it is not dispositive that the robberies involved the invasion of the victims' homes. Many businesses, including illegal drug enterprises, operate out of homes. As the Supreme Court has emphasized, commercial activities in or near the home may have a significant cumulative effect upon interstate commerce. See Raich, 545 U.S. at 19 (holding that, "when viewed in the aggregate, . . . Congress had a rational basis for concluding that leaving home-consumed marijuana outside federal control would . . . affect price and market conditions"); Wickard, 317 U.S. at 128 ("It can hardly be denied that a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions."). Thus, the locus of the commercial activity is not the litmus test of a Hobbs Act violation.

B.

We now turn to the merits of Taylor's claims. He first contends that the government was required to offer particularized evidence that his personal robberies affected

11

interstate commerce and that, because the government offered no such evidence, the district court lacked jurisdiction over his prosecution under the Hobbs Act. In an appeal contesting the sufficiency of the evidence, we view "the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the Government" and uphold the verdict if it is supported by substantial evidence. Williams, 342 F.3d at 355 (internal quotation marks omitted).

At the conclusion of trial, the district court instructed the jury on the jurisdictional element as follows:

> In considering . . . whether there has been an obstruction, delay, or effect on interstate commerce, I tell you that the government has met its burden of proof if you find and believe from the evidence beyond a reasonable doubt that the defendant reduced the movement of articles and commodities in interstate commerce, in this case illegal drugs and drug proceeds, or attempted to do so by the robberies charged in Counts One and Three.
>
> It is not necessary for the government to prove that the defendant intended to affect interstate commerce; rather, this element may be proven by evidence that a defendant's actions were likely to affect interstate commerce, even though the actual impact on commerce is small.

J.A. 673-74. These instructions were in accord with the law as described above and Taylor's argument thus rests solely on the sufficiency of the evidence with regard to the jurisdictional predicate. But while Taylor contends that the government failed

12

to prove the jurisdictional element, we find that the jury could rationally have found that the government met its burden.

First, it was entirely reasonable for the jury to conclude that the robberies "would have the effect of depleting the assets of an entity engaged in interstate commerce." Buffey, 899 F.2d at 1404. In Williams, we found that drug dealing was "an inherently economic enterprise that affects interstate commerce." 342 F.3d at 355. Although Williams involved cocaine and Taylor's robberies involved marijuana, the principle of aggregation does not apply differently for different drugs. See Raich, 545 U.S. at 18-19 (applying the aggregation principle to the market for marijuana). Because drug dealing in the aggregate necessarily affects interstate commerce, the government was simply required to prove that Taylor depleted or attempted to deplete the assets of such an operation.

Sufficient evidence was adduced at trial for a rational jury to find that Whorley was a drug dealer and that Taylor depleted or attempted to deplete his assets during the August 27 robbery. The record shows that the Goonz were in the business of robbing drug dealers, Fitzgerald testified that he selected Whorley's house to rob because he was informed that a drug dealer lived there, and testimony further revealed that Taylor took part in the robbery because he expected to find drugs and drug proceeds in the home. Furthermore, Whorley admitted to

13

having sold drugs in the past and Graham did in fact possess marijuana at the time of the robbery. A Roanoke City detective testified that drug dealers are commonly victims of repeated home invasions and that he suspected Whorley of being a drug dealer because Whorley's house had been broken into at least twice prior to the August 27 robbery.

Additionally, the money, jewelry, cell phones, and marijuana cigarette that Taylor stole are sufficient to meet the de minimis standard under the depletion-of-assets theory. "We have never held . . . that the depletion of assets theory has a dollar-amount minimum." Tillery, 702 F.3d at 175. But even if these items together do not meet that low threshold, the jury could rationally have concluded that Taylor attempted to steal drugs and drug proceeds, and therefore satisfied the Hobbs Act jurisdictional element. See Brantley, 777 F.2d at 163-64 (holding that Hobbs Act jurisdictional element may be satisfied by inchoate crimes).

Likewise, the government proffered sufficient evidence for a rational jury to conclude that Lynch was a drug dealer and that Taylor depleted or attempted to deplete his assets in the October 21 robbery. As with the robbery of Whorley, the Goonz was a group dedicated to robbing drug dealers. Fitzgerald testified that he had received intelligence from a reliable informant that Lynch was a drug dealer and had previously been

14

robbed of twenty pounds of marijuana. Additional testimony revealed that Taylor thought there would be drugs and drug proceeds in the house. Fitzgerald called Lynch by his nickname, "W.T.," and, when he demanded that Lynch hand over the drugs, Lynch told him that the marijuana was with another person. Moreover, a federal officer testified that Lynch admitted that he had sold drugs before the robbery without his wife's knowledge and Lynch's wife testified that he associated with suspicious characters who used and possessed illegal drugs. As with Whorley, the jury could rationally have found that Taylor attempted to deprive Lynch's operation of both drugs and drug proceeds and found jurisdiction accordingly. There was thus sufficient evidence at trial for the jury to have determined that the jurisdictional element was satisfied under a depletion-of-assets theory for both the Whorley and Lynch robberies.

Apart from the effect on the assets of an operation whose character involves interstate commerce, there was evidence that the defendant intentionally targeted a business engaged in interstate commerce. See Powell, 693 F.3d at 405. While evidence of the defendant's intent is not required to prove that his robberies had an impact on interstate commerce, that intent is still probative on the question of whether his actions would have had the "natural consequence[]" of affecting such commerce. See id. (finding jurisdictional element met because defendant

15

"deliberately sought to rob business owners to obtain proceeds of businesses engaged in interstate commerce").

Under the targeting theory, a defendant who robs a victim in the belief that he will recover the proceeds of an enterprise engaged in interstate commerce will not fortuitously escape prosecution under the Hobbs Act because his target did not possess those proceeds at the precise time of the robbery. See Brantley, 777 F.2d at 162 ("It may be enough [to prove the jurisdictional predicate] that the parties intended to complete a transaction which would have affected commerce, though their intention was frustrated."). The amount of cash on hand in a drug dealing enterprise fluctuates dramatically; the victims were doubtless targeted by Taylor and the other Goonz in the hope they would be found at a flush moment. That they were not does nothing to vitiate Taylor's intent to target an enterprise which by its nature engages in interstate commercial activity.

The evidence here was thus sufficient for two independent reasons. Whether viewed through the lens of the effect of the defendant's crimes (depletion of assets) or his intent (targeting), the government adduced sufficient evidence in this case to meet the jurisdictional element of the Hobbs Act. We

16

therefore sustain Taylor's Hobbs Act convictions.[*]  As Taylor challenged his conviction for using or carrying a firearm in furtherance of a crime of violence under 18 U.S.C. § 924(c) solely on the ground that the Hobbs Act predicate was infirm, that conviction too must be upheld.

This is not to imply that the reach of the Hobbs Act is without limits.  All robberies are disruptive, but not every disruption is an obstruction of commerce.  The Sixth Circuit, for example, held that the jurisdictional element of the Hobbs Act was not satisfied when the defendant stood convicted of robbing "private citizens in a private residence" of money, some of which just happened to "belong[] to a restaurant doing business in interstate commerce." United States v. Wang, 222 F.3d 234, 240 (6th Cir. 2000).  Whatever connection between the robbery and the business was absent in Wang is plainly present in the case at bar.

---

[*] Taylor's second argument is that the district court erred in granting the government's pretrial motion in limine precluding him from presenting evidence that the marijuana at issue was grown in Virginia and thus was not connected to interstate commerce.  We review the district court's evidentiary rulings for abuse of discretion.  United States v. Moore, 27 F.3d 969, 974 (4th Cir. 1994).

The district court found that, because drug dealing enterprises inherently affect interstate commerce, any argument or evidence tending to show that the drugs in the particular case had not moved across state lines was not relevant.  For the reasons expressed in Part II.A, supra, that ruling was correct, and the trial court necessarily did not abuse its discretion in granting the government's motion.

17

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED