(Slip Opinion) OCTOBER TERM, 2015 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TAYLOR *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 14–6166. Argued February 23, 2016—Decided June 20, 2016

Petitioner Taylor was indicted under the Hobbs Act on two counts of affecting commerce or attempting to do so through robbery for his participation in two home invasions targeting marijuana dealers. In both cases, Taylor and other gang members broke into the homes, confronted the residents, demanded the location of drugs and money, found neither, and left relatively empty handed.

Taylor's trial resulted in a hung jury. At his retrial, the Government urged the trial court to preclude Taylor from offering evidence that the drug dealers he targeted dealt only in locally-grown marijuana. The trial court excluded that evidence and Taylor was convicted on both counts. The Fourth Circuit affirmed, holding that, given the aggregate effect of drug dealing on interstate commerce, the Government needed only to prove that Taylor robbed or attempted to rob a drug dealer of drugs or drug proceeds to satisfy the commerce element.

*Held*:

1. The prosecution in a Hobbs Act robbery case satisfies the Act's commerce element if it shows that the defendant robbed or attempted to rob a drug dealer of drugs or drug proceeds. Pp. 4–9.

(a) The language of the Hobbs Act is unmistakably broad and reaches any obstruction, delay, or other effect on commerce, 18 U. S. C. §1951(a), "over which the United States has jurisdiction," §1951(b)(3). See *United States* v. *Culbert*, 435 U. S. 371, 373. Pp. 4–5.

(b) Under its commerce power, this Court has held, Congress may regulate, among other things, activities that have a substantial aggregate effect on interstate commerce, see *Wickard* v. *Filburn*, 317 U. S. 111, 125. This includes "purely local activities that are part of

an economic 'class of activities' that have a substantial effect on interstate commerce," *Gonzales* v. *Raich*, 545 U. S. 1, 17, so long as those activities are economic in nature. See *United States* v. *Morrison*, 529 U. S. 598, 613. One such "class of activities" is the production, possession, and distribution of controlled substances. 545 U. S*.,* at 22. Grafting the holding in *Raich* onto the Hobbs Act's commerce element, it follows that a robber who affects even the intrastate sale of marijuana affects commerce over which the United States has jurisdiction. Pp. 5–6.

(c) In arguing that *Raich* should be distinguished because the Controlled Substances Act lacks the Hobbs Act's additional commerce element, Taylor confuses the standard of proof with the meaning of the element that must be proved. The meaning of the Hobbs Act's commerce element is a question of law, which, *Raich* establishes, includes purely intrastate drug production and sale. Applying, without expanding, *Raich*'s interpretation of the scope of Congress's Commerce Clause power, if the Government proves beyond a reasonable doubt that a robber targeted a marijuana dealer's drugs or illegal proceeds, the Government has proved beyond a reasonable doubt that commerce over which the United States has jurisdiction was affected. Pp. 6–9.

2. Here, the Government met its burden by introducing evidence that Taylor's gang intentionally targeted drug dealers to obtain drugs and drug proceeds. That evidence included information that the gang members targeted the victims because of their drug dealing activities, as well as explicit statements made during the course of the robberies that revealed their belief that drugs and money were present. Such proof is sufficient to meet the Hobbs Act's commerce element. P. 9.

754 F. 3d 217, affirmed.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. THOMAS, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 14–6166

———————

## DAVID ANTHONY TAYLOR, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 20, 2016]

JUSTICE ALITO delivered the opinion of the Court.

The Hobbs Act makes it a crime for a person to affect commerce, or to attempt to do so, by robbery. 18 U. S. C. §1951(a). The Act defines "commerce" broadly as interstate commerce "and all other commerce over which the United States has jurisdiction." §1951(b)(3). This case requires us to decide what the Government must prove to satisfy the Hobbs Act's commerce element when a defendant commits a robbery that targets a marijuana dealer's drugs or drug proceeds.

The answer to this question is straightforward and dictated by our precedent. We held in *Gonzales* v. *Raich*, 545 U. S. 1 (2005), that the Commerce Clause gives Congress authority to regulate the national market for marijuana, including the authority to proscribe the purely intrastate production, possession, and sale of this controlled substance. Because Congress may regulate these intrastate activities based on their aggregate effect on interstate commerce, it follows that Congress may also regulate intrastate drug *theft*. And since the Hobbs Act criminalizes robberies and attempted robberies that affect

any commerce "over which the United States has jurisdiction," §1951(b)(3), the prosecution in a Hobbs Act robbery case satisfies the Act's commerce element if it shows that the defendant robbed or attempted to rob a drug dealer of drugs or drug proceeds. By targeting a drug dealer in this way, a robber necessarily affects or attempts to affect commerce over which the United States has jurisdiction.

In this case, petitioner Anthony Taylor was convicted on two Hobbs Act counts based on proof that he attempted to rob marijuana dealers of their drugs and drug money. We hold that this evidence was sufficient to satisfy the Act's commerce element.

I

Beginning as early as 2009, an outlaw gang called the "Southwest Goonz" committed a series of home invasion robberies targeting drug dealers in the area of Roanoke, Virginia. 754 F. 3d 217, 220 (CA4 2014). For obvious reasons, drug dealers are more likely than ordinary citizens to keep large quantities of cash and illegal drugs in their homes and are less likely to report robberies to the police. For participating in two such home invasions, Taylor was convicted of two counts of Hobbs Act robbery, in violation of §1951(a), and one count of using a firearm in furtherance of a crime of violence, in violation of §924(c).

The first attempted drug robbery for which Taylor was convicted occurred in August 2009. *Id.*, at 220. Taylor and others targeted the home of Josh Whorley, having obtained information that Whorley dealt "exotic and high grade" marijuana. *Ibid.* "The robbers expected to find both drugs and money" in Whorley's home. *Ibid.* Taylor and the others broke into the home, searched it, and assaulted Whorley and his girlfriend. They demanded to be told the location of money and drugs but, not locating any, left with only jewelry, $40, two cell phones, and a mariju-

ana cigarette. *Ibid.*

The second attempted drug robbery occurred two months later in October 2009 at the home of William Lynch. *Ibid.* A source informed the leader of the gang that, on a prior occasion, the source had robbed Lynch of 20 pounds of marijuana in front of Lynch's home. The gang also received information that Lynch continued to deal drugs. Taylor and others broke into Lynch's home, held his wife and young children at gunpoint, assaulted his wife, and demanded to know the location of his drugs and money. Again largely unsuccessful, the robbers made off with only a cell phone. *Id.,* at 221.

For his participation in these two home invasions, Taylor was indicted under the Hobbs Act on two counts of affecting commerce or attempting to do so through robbery. App. 11a–13a. His first trial resulted in a hung jury. On retrial, at the urging of the Government, the District Court precluded Taylor from introducing evidence that the drug dealers he targeted might be dealing in only locally grown marijuana. *Id.,* at 60a; see 754 F. 3d, at 221. During the second trial, Taylor twice moved for a judgment of acquittal on the ground that the prosecution had failed to meet its burden on the commerce element, Tr. 445–447, 532–533; see 754 F. 3d, at 221, but the District Court denied those motions, holding that the proof that Taylor attempted to rob drug dealers was sufficient as a matter of law to satisfy that element. Tr. 446, 532–533. The jury found Taylor guilty on both of the Hobbs Act counts and one of the firearms counts. App. 67a–69a.

On appeal, Taylor challenged the sufficiency of the evidence to prove the commerce element of the Hobbs Act, but the Fourth Circuit affirmed. "Because drug dealing in the aggregate necessarily affects interstate commerce," the court reasoned, "the government was simply required to prove that Taylor depleted or attempted to deplete the assets of such an operation." 754 F. 3d, at 224.

We granted certiorari to resolve a conflict in the Circuits regarding the demands of the Hobbs Act's commerce element in cases involving the theft of drugs and drug proceeds from drug dealers. 576 U. S. ___ (2015).

## II
### A

The Hobbs Act provides in relevant part as follows:

"Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery . . . or attempts or conspires so to do . . . shall be fined under this title or imprisoned not more than twenty years, or both." 18 U. S. C. §1951(a).

The Act then defines the term "commerce" to mean

"commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction." §1951(b)(3).

The language of the Hobbs Act is unmistakably broad. It reaches any obstruction, delay, or other effect on commerce, even if small, and the Act's definition of commerce encompasses "all . . . commerce over which the United States has jurisdiction." *Ibid.* We have noted the sweep of the Act in past cases. *United States* v. *Culbert*, 435 U. S. 371, 373 (1978) ("These words do not lend themselves to restrictive interpretation"); *Stirone* v. *United States*, 361 U. S. 212, 215 (1960) (The Hobbs Act "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical

violence").

## B

To determine how far this commerce element extends—
and what the Government must prove to meet it—we look
to our Commerce Clause cases. We have said that there
are three categories of activity that Congress may regulate
under its commerce power: (1) "the use of the channels of
interstate commerce"; (2) "the instrumentalities of inter-
state commerce, or persons or things in interstate com-
merce, even though the threat may come only from intra-
state activities"; and (3) "those activities having a
substantial relation to interstate commerce, . . . *i. e.,* those
activities that substantially affect interstate commerce."
*United States* v. *Lopez*, 514 U. S. 549, 558–559 (1995). We
have held that activities in this third category—those that
"substantially affect" commerce—may be regulated so long
as they substantially affect interstate commerce in the
aggregate, even if their individual impact on interstate
commerce is minimal. See *Wickard* v. *Filburn*, 317 U. S.
111, 125 (1942) ("[E]ven if appellee's activity be local and
though it may not be regarded as commerce, it may still,
whatever its nature, be reached by Congress if it exerts a
substantial economic effect on interstate commerce").

While this final category is broad, "thus far in our Na-
tion's history our cases have upheld Commerce Clause
regulation of intrastate activity only where that activity is
economic in nature." *United States* v. *Morrison*, 529 U. S.
598, 613 (2000).

In this case, the activity at issue, the sale of marijuana,
is unquestionably an economic activity. It is, to be sure, a
form of business that is illegal under federal law and the
laws of most States. But there can be no question that
marijuana trafficking is a moneymaking endeavor—and a
potentially lucrative one at that.

In *Raich*, the Court addressed Congress's authority to

regulate the marijuana market. The Court reaffirmed "Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." 545 U. S., at 17. The production, possession, and distribution of controlled substances constitute a "class of activities" that in the aggregate substantially affect interstate commerce, and therefore, the Court held, Congress possesses the authority to regulate (and to criminalize) the production, possession, and distribution of controlled substances even when those activities occur entirely within the boundaries of a single State. Any other outcome, we warned, would leave a gaping enforcement hole in Congress's regulatory scheme. *Id.*, at 22.

The case now before us requires no more than that we graft our holding in *Raich* onto the commerce element of the Hobbs Act. The Hobbs Act criminalizes robberies affecting "commerce over which the United States has jurisdiction." §1951(b)(3). Under *Raich*, the market for marijuana, including its intrastate aspects, is "commerce over which the United States has jurisdiction." It therefore follows as a simple matter of logic that a robber who affects or attempts to affect even the intrastate sale of marijuana grown within the State affects or attempts to affect commerce over which the United States has jurisdiction.

## C

Rejecting this logic, Taylor takes the position that the robbery or attempted robbery of a drug dealer's inventory violates the Hobbs Act only if the Government proves something more. This argument rests in part on the fact that *Raich* concerned the Controlled Substances Act (CSA), the criminal provisions of which lack a jurisdictional element. See 21 U. S. C. §§841(a), 844. The Hobbs Act, by contrast, contains such an element—namely, the

conduct criminalized must affect or attempt to affect commerce in some way or degree. See 18 U. S. C. §1951(a). Therefore, Taylor reasons, the prosecution must prove beyond a reasonable doubt either (1) that the particular drugs in question originated or were destined for sale out of State or (2) that the particular drug dealer targeted in the robbery operated an interstate business. See Brief for Petitioner 25–27; Reply Brief 8. The Second and Seventh Circuits have adopted this same argument. See *United States* v. *Needham*, 604 F. 3d 673, 681 (CA2 2010); *United States* v. *Peterson*, 236 F. 3d 848, 855 (CA7 2001).

This argument is flawed. It confuses the standard of proof with the meaning of the element that must be proved. There is no question that the Government in a Hobbs Act prosecution must prove beyond a reasonable doubt that the defendant engaged in conduct that satisfies the Act's commerce element, but the meaning of that element is a question of law. And, as noted, *Raich* established that the purely intrastate production and sale of marijuana is commerce over which the Federal Government has jurisdiction. Therefore, if the Government proves beyond a reasonable doubt that a robber targeted a marijuana dealer's drugs or illegal proceeds, the Government has proved beyond a reasonable doubt that commerce over which the United States has jurisdiction was affected.

The only way to escape that conclusion would be to hold that the Hobbs Act does not exercise the full measure of Congress's commerce power. But we reached the opposite conclusion more than 50 years ago, see *Stirone*, 361 U. S., at 215, and it is not easy to see how the expansive language of the Act could be interpreted in any other way.

This conclusion does not make the commerce provision of the Hobbs Act superfluous. That statute, unlike the criminal provisions of the CSA, applies to forms of conduct

that, even in the aggregate, may not substantially affect commerce. The Act's commerce element ensures that applications of the Act do not exceed Congress's authority. But in a case like this one, where the target of a robbery is a drug dealer, proof that the defendant's conduct in and of itself affected or threatened commerce is not needed. All that is needed is proof that the defendant's conduct fell within a category of conduct that, in the aggregate, had the requisite effect.

D

Contrary to the dissent, see *post,* at 10–12 (opinion of THOMAS, J.), today's holding merely applies—it in no way expands—*Raich*'s interpretation of the scope of Congress's power under the Commerce Clause. The dissent resists the substantial-effects approach and the aggregation principle on which *Raich* is based, see *post*, at 11–12. But we have not been asked to reconsider *Raich*. So our decision in *Raich* controls the outcome here. As long as Congress may regulate the purely intrastate possession and sale of illegal drugs, Congress may criminalize the theft or attempted theft of those same drugs.

We reiterate what this means. In order to obtain a conviction under the Hobbs Act for the robbery or attempted robbery of a drug dealer, the Government need not show that the drugs that a defendant stole or attempted to steal either traveled or were destined for transport across state lines. Rather, to satisfy the Act's commerce element, it is enough that a defendant knowingly stole or attempted to steal drugs or drug proceeds, for, as a matter of law, the market for illegal drugs is "commerce over which the United States has jurisdiction." And it makes no difference under our cases that any actual or threatened effect on commerce in a particular case is minimal. See *Perez* v. *United States*, 402 U. S. 146, 154 (1971) ("Where the class of activities is regulated and that class

is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class" (emphasis deleted)).

### E

In the present case, the Government met its burden by introducing evidence that Taylor's gang intentionally targeted drug dealers to obtain drugs and drug proceeds. One of the victims had been robbed of substantial quantities of drugs at his residence in the past, and the other was thought to possess high-grade marijuana. The robbers also made explicit statements in the course of the robberies revealing that they believed that the victims possessed drugs and drug proceeds. Tr. 359 (asking Lynch "where the weed at"); *id.*, at 93 (asking Whorley "where the money was at, where the weed was at"); *id.*, at 212–213 (asking Whorley, "Where is your money and where is your weed at?"). Both robberies were committed with the express intent to obtain illegal drugs and the proceeds from the sale of illegal drugs. Such proof is sufficient to meet the commerce element of the Hobbs Act.

Our holding today is limited to cases in which the defendant targets drug dealers for the purpose of stealing drugs or drug proceeds. We do not resolve what the Government must prove to establish Hobbs Act robbery where some other type of business or victim is targeted. See, *e.g., Stirone*, *supra*, at 215 (Government offered evidence that the defendant attempted to extort a concrete business that actually obtained supplies and materials from out of State).

\*    \*    \*

The judgment of the Fourth Circuit is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 14–6166

———————

## DAVID ANTHONY TAYLOR, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[June 20, 2016]

JUSTICE THOMAS, dissenting.

The Hobbs Act makes it a federal crime to commit a robbery that "affects" "commerce over which the United States has jurisdiction." 18 U. S. C. §§1951(a), 1951(b)(3). Under the Court's decision today, the Government can obtain a Hobbs Act conviction without proving that the defendant's robbery in fact affected interstate commerce— or any commerce. See *ante,* at 5–9. The Court's holding creates serious constitutional problems and extends our already expansive, flawed commerce-power precedents. I would construe the Hobbs Act in accordance with constitutional limits and hold that the Act punishes a robbery only when the Government proves that the robbery itself affected interstate commerce.

I

In making it a federal crime to commit a robbery that "affects commerce," §1951(a), the Hobbs Act invokes the full reach of Congress' commerce power: The Act defines "commerce" to embrace "all . . . commerce over which the United States has jurisdiction." §1951(b)(3). To determine the Hobbs Act's reach, I start by examining the limitations on Congress' authority to punish robbery under its commerce power. In light of those limitations and in accordance with the Hobbs Act's text, I would hold

that the Government in a Hobbs Act case may obtain a conviction for robbery only if it proves, beyond a reasonable doubt, that the defendant's robbery itself affected interstate commerce. The Government may not obtain a conviction by proving only that the defendant's robbery affected intrastate commerce or other intrastate activity.

A

Congress possesses only limited authority to prohibit and punish robbery. "The Constitution creates a Federal Government of enumerated powers." *United States* v. *Lopez*, 514 U. S. 549, 552 (1995); see Art. I, §8; *Marbury* v. *Madison*, 1 Cranch 137, 176 (1803) (Marshall, C. J.) ("The powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written"). As with its powers generally, Congress has only limited authority over crime. The Government possesses broad general authority in territories and federal enclaves. See Art. I, §8, cl. 17 (conferring power of "exclusive Legislation" over the District of Columbia); Art. IV, §3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States"). But its power over crimes committed in the States is very different. The Constitution expressly delegates to Congress authority over only four specific crimes: counterfeiting securities and coin of the United States, Art. I, §8, cl. 6; piracies and felonies committed on the high seas, Art. I, §8, cl. 10; offenses against the law of nations, *ibid.*; and treason, Art. III, §3, cl. 2. Given these limited grants of federal power, it is "clea[r] that Congress cannot punish felonies generally." *Cohens* v. *Virginia*, 6 Wheat. 264, 428 (1821) (Marshall, C. J.). Congress has "no general right to punish murder committed within any of the States," for example, and no general right to punish the many crimes that fall outside of Congress' express

grants of criminal authority. *Id.*, at 426. "The Constitution," in short, "withhold[s] from Congress a plenary police power." *Lopez*, *supra*, at 566; see Art. I, §8; Amdt. 10.

Beyond the four express grants of federal criminal authority, then, Congress may validly enact criminal laws only to the extent that doing so is "necessary and proper for carrying into Execution" its enumerated powers or other powers that the Constitution vests in the Federal Government. Art. I, §8, cl. 18. As Chief Justice Marshall explained, "the [federal] government may, legitimately, punish any violation of its laws" as a necessary and proper means for carrying into execution Congress' enumerated powers. *McCulloch* v. *Maryland*, 4 Wheat. 316, 416 (1819); see *id.,* at 416–421. But if these limitations are not respected, Congress will accumulate the general police power that the Constitution withholds.

The scope of Congress' power to punish robbery in the Hobbs Act—or in any federal statute—must be assessed in light of these principles. The Commerce Clause—the constitutional provision that the Hobbs Act most clearly invokes—does not authorize Congress to punish robbery. That Clause authorizes Congress to regulate "Commerce . . . among the several States." Art. I, §8, cl. 3. Robbery is not "Commerce" under that Clause. At the founding, "commerce" "consisted of selling, buying, and bartering, as well as transporting for these purposes." *Lopez*, *supra*, at 585 (THOMAS, J., concurring). The Commerce Clause, as originally understood, thus "empowers Congress to regulate the buying and selling of goods and services trafficked across state lines." *Gonzales* v. *Raich*, 545 U. S. 1, 58 (2005) (THOMAS, J., dissenting). Robbery is not buying, it is not selling, and it cannot plausibly be described as a commercial transaction ("trade or exchange for value"). *Id.*, at 59.

Because Congress has no freestanding power to punish robbery and because robbery is not itself "Commerce,"

Congress may prohibit and punish robbery only to the extent that doing so is "necessary and proper for carrying into Execution" Congress' power to regulate commerce. Art. I, §8, cl. 18. To be "necessary," Congress' prohibition of robbery must be "plainly adapted" to regulating interstate commerce. *McCulloch*, *supra*, at 421. This means that Congress' robbery prohibition must have an "obvious, simple, and direct relation" with the regulation of interstate commerce. *Raich*, *supra*, at 61 (THOMAS, J., dissenting) (internal quotation marks omitted). And for Congress' robbery prohibition to be "proper," it cannot be "prohibited" by the Constitution or inconsistent with its "letter and spirit." *McCulloch*, *supra*, at 421; see *United States* v. *Comstock*, 560 U. S. 126, 161 (2010) (THOMAS, J., dissenting) (same).

### B

With those principles in mind, I turn to the Hobbs Act. The Act provides,

> "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be [punished]." 18 U. S. C. §1951(a).

In keeping with Congress' authority to regulate certain commerce—but not robbery generally—the central feature of a Hobbs Act crime is an effect on commerce. The Act begins by focusing on commerce and then carefully describes the required relationship between the proscribed conduct and commerce: The Act uses active verbs— "obstructs," "delays," "affects"—to describe how a robbery must relate to commerce, making clear that a defendant's robbery must affect commerce.

The Act's reach depends on the meaning of "commerce," which the Act defines as

> "commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction." §1951(b)(3).

As noted above, this provision is comprehensive and appears to invoke all of Congress' commerce power. The first clause of the definition invokes Congress' broad police power, including power over internal commerce, in the District of Columbia and the Territories. See Art. I, §8, cl. 17 (District of Columbia); Art. IV, §3, cl. 2 (territories). The second and third clauses most clearly invoke those broad powers as well as Congress' power "[t]o regulate Commerce . . . among the several States." Art. I, §8, cl. 3. The final clause invokes all federal commerce power not covered in the previous clauses. It invokes (to the extent that the second and third clauses do not already do so) Congress' authority "[t]o regulate Commerce with foreign Nations . . . and with the Indian Tribes." *Ibid.*

The critical question in this case is whether the commerce definition's final clause extends further, to some intrastate activity. Given the limitations imposed by the Constitution, I would construe this clause not to reach such activity.

As explained above, for the Hobbs Act to constitutionally prohibit robberies that interfere with intrastate activity, that prohibition would need to be "necessary and proper for carrying into Execution" Congress' power to regulate interstate commerce, Art. I, §8, cls. 3, 18. See Part I–A, *supra*. Punishing a local robbery—one that affects only

intrastate commerce or other intrastate activity—cannot satisfy that standard.  Punishing a local robbery does not bear a "direct relation" to the regulation of interstate commerce, so it would not be "necessary."  *Raich*, 545 U. S*.,* at 61 (THOMAS, J., dissenting) (internal quotation marks omitted).  Nor would punishing such a robbery be "proper."  Permitting Congress to criminalize such robberies would confer on Congress a general police power over the Nation—even though the Constitution confers no such power on Congress.  *Lopez*, 514 U. S., at 566; see *Raich*, 545 U. S., at 65 (THOMAS, J., dissenting).  Allowing the Federal Government to reach a simple home robbery, for example, would "encroac[h] on States' traditional police powers to define the criminal law and to protect . . . their citizens."  *Id.*, at 66.  This would "subvert basic principles of federalism and dual sovereignty," *id.,* at 65, and would be inconsistent with the "letter and spirit" of the Constitution, *McCulloch*, 4 Wheat., at 421.

Thus, the Hobbs Act reaches a local robbery only when that particular robbery "obstructs, delays, or affects" *interstate* commerce.  §§1951(a), 1951(b)(3).  So construed, the Hobbs Act validly punishes robbery.  Congress' power "[t]o regulate Commerce . . . among the several States," Art. I, §8, cl. 3, "would lack force or practical effect if Congress lacked the authority to enact criminal laws" prohibiting interference with interstate commerce or the movement of articles or goods in interstate commerce, *Comstock*, *supra*, at 169 (THOMAS, J., dissenting).  The Hobbs Act's prohibition on such interferences thus helps to "carr[y] into Execution" Congress' enumerated power to regulate interstate commerce.  Art. I, §8, cls. 3, 18.  A prohibition on such interference by robbery bears an "obvious, simple, and direct relation" to regulating interstate commerce: it allows commerce to flow between States unobstructed.  *Raich, supra*, at 61 (THOMAS, J., dissenting) (internal quotation marks omitted).  It is therefore

"necessary." And such a prohibition accords with the limited nature of the powers that the Constitution confers on Congress, by adhering to the categories of commerce that the Constitution authorizes Congress to regulate and by keeping Congress from exercising a general police power. See, *e.g., Lopez, supra,* at 566. It is accordingly "proper" to that extent. If construed to reach a robbery that does not affect interstate commerce, however, the Hobbs Act exceeds Congress' authority because it is no longer "necessary and proper" to the execution of Congress' power "[t]o regulate Commerce . . . among the several States," Art. I, §8, cls. 3, 18. See Part I–A, *supra*.

Robberies that might satisfy these principles would be those that affect the channels of interstate commerce or instrumentalities of interstate commerce. A robbery that forces an interstate freeway to shut down thus may form the basis for a valid Hobbs Act conviction. So too might a robbery of a truckdriver who is in the course of transporting commercial goods across state lines. But if the Government cannot prove that a robbery in a State affected interstate commerce, then the robbery is not punishable under the Hobbs Act. Sweeping in robberies that do not affect interstate commerce comes too close to conferring on Congress a general police power over the Nation.

Given the Hobbs Act's text and relevant constitutional principles, the Government in a Hobbs Act robbery case (at least one that involves only intrastate robbery) must prove, beyond a reasonable doubt, that the defendant's robbery itself affected interstate commerce. See *Alleyne* v. *United States*, 570 U. S. \_\_\_, \_\_\_ (2013) (opinion of THOMAS, J.) (slip op., at 3) (the Sixth Amendment right to a trial "'by an impartial jury,'" in conjunction with our due process precedents, "requires that each element of a crime be proved to the jury beyond a reasonable doubt"); *In re Winship*, 397 U. S. 358, 364 (1970) (requiring reasonable-doubt showing on each element of a crime).

## C

On this interpretation of the Hobbs Act, petitioner David Anthony Taylor's convictions cannot stand. The Government cites no evidence that Taylor actually obstructed, delayed, or affected interstate commerce when he committed the two intrastate robberies here. The Government did not prove that Taylor affected any channel of interstate commerce, instrumentality of commerce, or person or thing in interstate commerce. See *Lopez, supra,* at 558–559 (describing these core areas of commerce regulation). Nor did the Government prove that Taylor affected an actual commercial transaction—let alone an interstate commercial transaction. At most, the Government proved instead that Taylor robbed two drug dealers in their homes in Virginia; that the marijuana that Taylor expected to (but did not) find in these robberies might possibly at some point have crossed state lines; and that Taylor expected to find large amounts of marijuana. See Brief for United States 35–37; Tr. 63–69, 354, 420–421. Under the principles set forth above, that is not sufficient to bring Taylor's robberies within the Hobbs Act's reach. We should reverse Taylor's Hobbs Act convictions.

## II

Upholding Taylor's convictions, the Court reads the Hobbs Act differently. See *ante,* at 5–9. The Court concludes that the "commerce over which the United States has jurisdiction," §1951(b)(3), includes intrastate activity. See *ante,* at 5–6. Under our modern precedents, as the Court notes, Congress may regulate not just the channels of interstate commerce, instrumentalities of interstate commerce, and persons or things moving in interstate commerce, but may also regulate "those activities having a substantial relation to interstate commerce, . . . *i. e.,* those activities that substantially affect interstate commerce." *Lopez, supra*, at 558–559; see *Wickard* v. *Filburn*, 317

U. S. 111, 125 (1942) ("[E]ven if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce"). The substantial-effects approach is broad, in part because of its "aggregation principle": Congress can regulate an activity—even an intrastate, noncommercial activity—if that activity falls within a "class of activities" that, "as a whole," "substantially affects interstate commerce," even if "any specific activity within the class" has no such effects "when considered in isolation." *Lopez*, 514 U. S., at 600 (THOMAS, J., concurring) (emphasis deleted). According to the Court, the final clause of the Hobbs Act's definition of commerce embraces this category of activities that, in the aggregate, substantially affect commerce. See *ante,* at 5–6. Any robbery that targets a marijuana dealer, the Court then holds, affects the type of intrastate activity that Congress may regulate under its commerce power. See *ante,* at 5–9. For at least three reasons, the Court's holding is in error.

A

Although our modern precedents (such as *Wickard*) embrace the substantial-effects approach, applying that approach to the Hobbs Act is tantamount to abandoning any limits on Congress' commerce power—even the slight limits recognized by our expansive modern precedents. As I have explained, if the Hobbs Act is construed to punish a robbery that by itself affects only intrastate activity, then the Act defies the constitutional design. See Part I, *supra*.

That is true even under our modern precedents. Even those precedents emphasize that "[t]he Constitution requires a distinction between what is truly national and what is truly local." *United States* v. *Morrison*, 529 U. S. 598, 617–618 (2000); see *Lopez*, 514 U. S*.,* at 567–568. The substantial-effects approach is at war with that prin-

ciple. To avoid giving Congress a general police power,
there must be some limit to what Congress can regulate.
But the substantial-effects approach's aggregation princi-
ple "has no stopping point." *Id.,* at 600 (THOMAS, J., con-
curring). "[O]ne *always* can draw the circle broadly
enough to cover an activity that, when taken in isolation,
would not have substantial effects on commerce." *Ibid.*
Under the substantial-effects approach, Congress could,
under its commerce power, regulate *any* robbery: In the
aggregate, any type of robbery could be deemed to sub-
stantially affect interstate commerce.

By applying the substantial-effects test to the criminal
prohibition before us, the Court effectively gives Congress
a police power. That is why the Court cannot identify any
true limit on its understanding of the commerce power.
Although the Court maintains that its holding "is limited
to cases in which the defendant targets drug dealers for
the purpose of stealing drugs or drug proceeds," *ante,* at 9,
its reasoning allows for unbounded regulation. Given that
the Hobbs Act can be read in a way that does not give
Congress a general police power, see Part I, *supra,* we
should not construe the statute as the Court does today.

## B

Applying the substantial-effects approach is especially
unsound here because it effectively relieves the Govern-
ment of its central burden in a criminal case—the burden
to prove every element beyond a reasonable doubt—and
because the Court's holding does not follow from even our
broad precedents. The Court reasons that, under *Gonza-
lez* v. *Raich*, 545 U. S. 1—a case that rests on substantial-
effects reasoning, see *id.,* at 17–22—"the market for mari-
juana, including its intrastate aspects, is 'commerce over
which the United States has jurisdiction.'" *Ante,* at 6
(quoting §1951(b)(3)). Therefore, "a robber who affects or
attempts to affect even the intrastate sale of marijuana

grown within the State affects or attempts to affect commerce over which the United States has jurisdiction." *Ante,* at 6. As the Court later states, "[W]here the target of a robbery is a drug dealer, proof that the defendant's conduct in and of itself affected or threatened commerce is not needed. All that is needed is proof that the defendant's conduct fell within a category of conduct that, in the aggregate, had the requisite effect." *Ante*, at 8.

*Raich* is too thin a reed to support the Court's holding. *Raich* upheld the federal Controlled Substances Act's regulation of "the intrastate manufacture and possession of marijuana" for personal medical use, 545 U. S., at 15, on the view that Congress "had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana" would undercut federal regulation of the broader interstate marijuana market, *id.,* at 22. The Court "stress[ed]" that it did not "need [to] determine whether [local cultivation and possession of marijuana], taken in the aggregate, substantially affect[ed] interstate commerce in fact, but only whether a 'rational basis' exist[ed] for so concluding." *Ibid.*

As an initial matter, *Raich* did not, as the Court suggests, hold that "the market for marijuana, including its intrastate aspects, is '*commerce* over which the United States has jurisdiction.'" *Ante,* at 6 (emphasis added). *Raich* held at most that the market for marijuana comprises *activities* that may substantially affect commerce over which the United States has jurisdiction. See, *e.g., Raich*, *supra*, at 21–22. Those activities are not necessarily "commerce," so *Raich*'s holding does not establish what the Hobbs Act's text requires.

But even if *Raich* established that the intrastate aspects of the marijuana market are "commerce over which the United States has jurisdiction," §1951(b)(3), *Raich* still would not establish the further point that the Court needs for its conclusion. Specifically, *Raich* would not establish

that a robbery affecting a drug dealer establishes, beyond a reasonable doubt, that the robber actually "obstructs, delays, or affects" the marijuana market. §1951(a). *Raich* did not hold that any activity relating to the marijuana market *in fact* affects commerce. *Raich* instead disclaimed the need to "determine whether" activities relating to the marijuana market—even "taken in the aggregate"— "substantially affect interstate commerce in fact." 545 U. S., at 22. *Raich* decided only that Congress had a rational basis—a merely "'conceivable'" basis, *FCC* v. *Beach Communications, Inc.*, 508 U. S. 307, 315 (1993)— for thinking that it needed to regulate that activity as part of an effective regulatory regime. 545 U. S., at 22. That is far from a finding, beyond a reasonable doubt, that a particular robbery relating to marijuana is an activity that affects interstate commerce. Grafting *Raich*'s "holding . . . onto the commerce element of the Hobbs Act" thus does not lead to the conclusion that "a robber who affects or attempts to affect . . . the intrastate sale of marijuana grown within [a] State affects or attempts to affect"— beyond a reasonable doubt—"commerce over which the United States has jurisdiction." *Ante,* at 6.

The Court's analysis thus provides no assurance that the Government has proved beyond a reasonable doubt that a Hobbs Act robbery defendant in fact affected commerce. And it unnecessarily extends our already broad precedents.

C

Finally, today's decision weakens longstanding protections for criminal defendants. The criminal law imposes especially high burdens on the Government in order to protect the rights of the accused. The Government may obtain a conviction only "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the accused] is charged." *Winship*, 397 U. S*.,* at

364. Those elements must be proved to a jury. Amdt. 6; see *Alleyne*, 570 U. S.*,* at ___ (opinion of THOMAS, J.) (slip op., at 3). Given the harshness of criminal penalties on "the rights of individuals," the Court has long recognized that penal laws "are to be construed strictly" to ensure that Congress has indeed decided to make the conduct at issue criminal. *United States* v. *Wiltberger*, 5 Wheat. 76, 95 (1820) (Marshall, C. J.). Thus, "before a man can be punished as a criminal under the federal law his case must be plainly and unmistakably within the provisions of some statute." *United States* v. *Gradwell*, 243 U. S. 476, 485 (1917) (internal quotation marks omitted). When courts construe criminal statutes, then, they must be especially careful. And when a broad reading of a criminal statute would upset federalism, courts must be more careful still. "[U]nless Congress conveys its purpose clearly," we do not deem it "to have significantly changed the federal-state balance in the prosecution of crimes." *Jones* v. *United States*, 529 U. S. 848, 858 (2000) (internal quotation marks omitted).

The substantial-effects test is in tension with these principles. That test—and the deferential, rational-basis review to which it is subjected, see *Raich*, *supra,* at 22— puts virtually no burdens on the Government. That should not come as a surprise because the substantial-effects test gained momentum not in the criminal context, but instead in the context in which courts most defer to the Government: the regulatory arena. *E.g., Wickard*, 317 U. S., at 113, 122–125, 128–129 (relying on substantial-effects reasoning to uphold regulatory restrictions on wheat under the Agricultural Adjustment Act of 1938). Without adequate reflection, the Court later extended this approach to the criminal context. In *Perez* v. *United States*, 402 U. S. 146 (1971), for example, the Court applied the substantial-effects approach to a criminal statute, holding that Congress could criminally punish

loansharking under its commerce power because
"[e]xtortionate credit transactions, though purely intra-
state, may in the judgment of Congress affect interstate
commerce" when judged as a "class of activities." *Id.,* at
154 (emphasis deleted); see *id.,* at 151–154, 156–157.

Even in extending the substantial-effects approach,
however, the Court still tried to impose some of the recog-
nized limits on the Government in the criminal context.
Just a year before it decided *Perez,* for example, the Court
held that the Government must prove each charged ele-
ment of a crime beyond a reasonable doubt. *Winship,*
*supra,* at 364. And the Court shortly thereafter gave a
potentially broad federal statute a narrow reading—a
reading that required a prohibited act to have a "demon-
strated nexus with interstate commerce," rather than a
lesser showing—based on lenity and federalism. *United*
*States* v. *Bass,* 404 U. S. 336, 349 (1971); see *id.,* at 339,
347–350. Indeed, the Court soon again invoked those
same principles in rejecting a broad interpretation of the
Hobbs Act itself. See *United States* v. *Enmons,* 410 U. S.
396, 410–412 (1973) (invoking principles of lenity and
federalism in construing the Hobbs Act not to reach the
use of violence to achieve legitimate union objectives).

Today, however, the Court fails to apply even those
limits. Today's decision fails to hold the Government to its
burden to prove, beyond a reasonable doubt, that the
defendant's robbery itself affected commerce. It fails to
identify language in the Hobbs Act that "'conveys . . .
clearly'" Congress' intention to reach the sorts of local,
small-scale robberies that States traditionally prosecute.
*Jones, supra,* at 858. And it fails to take our traditionally
careful approach to construing criminal statutes. Given
the problems with the Court's expansive reading of the
Hobbs Act, we cannot be sure that Taylor's "case" is "plainly
and unmistakably within the provisions of" the Act.
*Gradwell, supra,* at 485 (internal quotation marks omit-

ted).  It does not matter that Taylor committed a crime akin to the one that the Hobbs Act punishes.  "It would be dangerous" to punish someone for "a crime not enumerated in the statute" merely "because it is of equal atrocity, or of kindred character, with those which are enumerated." *Wiltberger*, *supra*, at 96.

The Court takes that "dangerous" step—and other dangerous steps—today.  It construes the Hobbs Act in a way that conflicts with the Constitution, with our precedents, and with longstanding protections for the accused. I would interpret the Hobbs Act in a way that is consistent with its text and with the Constitution.

\*    \*    \*

For these reasons, I respectfully dissent.